# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# DOCKET NO. 3:11-CR-00371

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| JOHN STACKS ) | |

**THIS MATTER** is before the Court upon Defendant's Motion to Suppress (Doc. No. 10). The Court held a hearing on the motion on February 27, 2012 and a supplemental hearing on May 3, 2012. Defendant's motion is DENIED for the reasons stated herein.

## I. FACTUAL BACKGROUND

Based on the testimony at the February 27, 2012 and May 3, 2012 hearings, the Court makes the following findings of fact:

1. Officer Bryan Overman has been a police officer for nineteen (19) years and has worked for the Charlotte-Mecklenburg Police Department for the last thirteen (13) years. As of the time of the incident in question, he had worked in the Steele Creek Division for nine (9) years. (Tr. 4.)

2. Officer Chandos Williams has been a police officer with the Charlotte-Mecklenburg Police Department for twenty-two (22) years. (Tr. 39.) He is assigned to the Steele Creek division, where he has been assigned his entire career except for five years, when he was assigned to the entire county. (Tr. 39.)

3. The Court finds both officers' testimony credible. They testified consistently, with the exception of minor differences of perception, and their veracity was not impeached.

4. The highest category of reported crimes in the Steele Creek area is larceny from automobiles and breaking and entering. Breaking into automobiles, and larceny from them, is a common incident. (Tr. 5, 40.) The Charlotte-Mecklenburg Police Department referred to this area as a "hot spot" for breaking and entering motor vehicles. (Tr. 7.)

5. Westpark Drive is within Charlotte-Mecklenburg Police's Steele Creek division. It is a street just off Interstate Seventy-Seven (77) on which about seven hotels are situated. (Tr. 6, 23.)

6. The hotels on Westpark Drive are beside each other in a row and on the same side of the street except for one. (Tr. 6.)

7. The Westpark Drive area is entirely commercial. There are no permanent residences in the area. (May 3, 2012 supplemental hr'g.)

8. Larceny from automobiles is especially common on Westpark Drive. (Tr. 6) ("[T]his particular area of our division has always been a hot spot for breaking and entering motor vehicle cases. It's a hot spot every month."); (Tr. 7); (May 3, 2012 supplemental hr'g.)

9. Car larcenies and vehicle break-ins generally occur between 2:00 a.m. and 6:00 a.m. on Westpark Drive. (Tr. 7); (see also Tr. 40.)

10. On or about March 18, 2011, a Charlotte-Mecklenburg Police lieutenant, Lieutenant Santaniello, asked Officers Overman and Williams to conduct

surveillance of the Westpark Drive area and the hotels along the corridor for the prevention of larceny from automobiles or vehicle break-ins. (Tr. 6, 41.)

11. Lieutenant Santaniello ordered surveillance in this area based on criminal activity reports from the previous months that showed a spike in the number of vehicle larceny and break-ins in the early morning hours along Westpark Drive. (Tr. 7, 41.)

12. At about 4:00 a.m., Officers Overman and Williams briefly surveyed the entire area in an unmarked police car (Tr. 45, 58), but in uniform (Tr. 45), before settling in a position perpendicular to Westpark Drive where the officers could see three and a half hotel parking lots along the corridor. (Tr. 9, 28, 42.) The officers were located approximately twenty-five (25) yards from the entrance of the closest hotel parking lot. (Tr. 28.)

13. There was little activity or traffic in the area at 4:00 a.m. (Tr. 9, 46-47.) The officers noticed a small number of people coming in and out of the hotel parking lots. These people were dropping employees off at the loading docks or the front offices (Tr. 9-10, 41), and there were some deliveries. (Tr. 41.) The officers observed fewer than six (6) cars in the area during this time. (Tr. 23.) They saw no one walking around the parking lots or walking in and out of the hotels. (Tr. 31.)

14. At approximately 4:30 a.m., when the officers had been in their surveillance position for about fifteen (15) to twenty (20) minutes (Tr. 23, 42, 58), both officers observed a brown two-door Cadillac driving down Westpark Drive. (Tr. 10, 42.) The Cadillac was driving down the right side of the street, the same side

as the hotels, which has more street lighting. (Tr. 11, 56.)

15. As the Cadillac drove down Westpark Drive, the driver, Defendant, was continually looking to his right, toward the hotel parking lots. He never once looked to the left. (Tr. 11, 43.)

16. Defendant was the only person in the car. (Tr. 11, 29, 43.)

17. Defendant drove into a hotel parking lot and began to drive up and down the rows of cars in the hotel parking lot (Tr. 12, 43), which were well lit. (Tr. 30.) Defendant then exited the hotel parking lot and entered another hotel parking lot, where he also drove up and down the rows of parked cars (Tr. 59.)

18. In total, Defendant went into three (3) different hotel parking lots and drove up and down the rows of parked cars in each of the three (3) parking lots. (Tr. 13.)

19. While driving up and down the rows of parked cars in the hotel parking lots, Defendant did not attempt to park, did not pick up any passengers, did not talk to anyone, did not let anyone out of the vehicle, and did not stop next to any other car. (Tr. 12-13, 43-44, 59.)

20. When Defendant went into the parking lot of the third hotel, the officers followed him into that parking lot and found him coming back out of the parking lot. (Tr. 13.)

21. As Defendant passed the officers, who were in uniform, Defendant's vehicle slowed down. Defendant turned around to look at the officers. Defendant turned almost all the way around, twisting in his seat, looking back toward the officers' vehicle as it passed. (Tr. 14-15, 45.) Defendant twisted 180 degrees with his head and turned his body almost 180 degrees. (Tr. 15.) Defendant looked

surprised. (Tr. 45.)

22. The officers then initiated an investigative traffic stop. (Tr. 15.)

23. Beginning shortly before Officer Williams activated the patrol lights, Officer Overman began typing the number of the license plate affixed to Defendant's vehicle into the patrol car's computer, as he routinely does. (May 3, 2012 supplemental hr'g.)

24. During the traffic stop, the computer outputted the owner of the automobile and the address of that owner, as well as a description of the automobile the license plate was registered to, which matched the vehicle that the officers stopped. The computer indicated the vehicle was registered to Joyce Clifton Stacks at 8021 Lobilia Lane in Charlotte. (May 3, 2012 supplemental hr'g.)

25. Joyce Clifton Stacks is Defendant's mother, with whom Defendant shares an address at 8021 Lobilia Lane. (May 3, 2012 supplemental hr'g).

26. Officer Williams radioed the license plate information and the location of the stop to a Charlotte-Mecklenburg Police dispatcher, as is standard for any traffic stop. This radio transmission was recorded by the police department and anyone can request a copy of that recording. (May 3, 2012 supplemental hr'g.)

27. The officers' car was equipped with a camera mounted inside the vehicle. The camera automatically saved its footage beginning a minute before the officers' patrol lights were activated. The police department saved a copy of the recording. (See Ex. 1, May 3, 2021 supplemental hr'g.)

28. When Defendant was pulled over, he was the only person in the car. (Tr. 45.)

29. The officers asked for and received Defendant's driver's license. (Tr. 16, 48.)

They asked for his license for an investigative purpose, to determine whether Defendant had a valid driver's license. (May 13, 2012 supplemental hr'g.)

30. Defendant stated to the officers that he was dropping someone off. (Tr. 16, 34.)

31. Defendant later stated that he was dropping off his girlfriend. (Tr. 18, 48.)

32. Defendant could not tell the officers exactly where he had dropped off his girlfriend. (Tr. 48-49.)

33. Defendant gave Officer Williams the name and phone number of Kenia Boo, who Defendant said was his girlfriend he had dropped off. (Tr. 49, 65.) After the traffic stop, Officer Williams called the phone number given to him by Defendant (Tr. 49) and the woman on the phone did not know what the officer was talking about. (Tr. 53.)

34. Defendant later called the Officer back from the same number, see *supra* ¶ 33, attempting to explain to Officer Williams why he left the scene and making excuses for leaving in such a hurry, see *infra* ¶ 39. Defendant then hung up the phone. (Tr. 53.)

35. As Defendant spoke with the officers during the traffic stop, he was noticeably nervous. He spoke quickly and fumbled with his cellular telephone. (Tr. 18.)

36. Officer Williams noticed a camouflage jacket in the back seat of Defendant's car spread out as if it was covering an object (Tr. 49-50, 62) and noticed a bulge underneath the jacket. (Tr. 63.) The officer also noticed a jacket on the front seat of Defendant's car. (Tr. 63.)

37. The officers ran a check for local warrants on Defendant and found none; however, in the process they found that Defendant had been arrested for several

armed robberies in the past. (Tr. 17, 35.)

38. Officer Williams asked Defendant whether he had any guns or other contraband in the car. (Tr. 50-51, 64.) Defendant replied that he did not and told the officers they could look in his car; however, immediately after saying that, he changed the subject and redirected the officers' attention to his story. (Tr. 51.)

39. As both officers were standing near the Defendant's vehicle, they asked Defendant to step out of the vehicle. Defendant did not step out of his vehicle, but instead sped away (Tr. 19, 50), leaving his driver's license with the officers. His tires squalled, as he accelerated rapidly and drove up Westpark Drive. (Tr. 19, 51, 65.) He had been stopped for about six (6) minutes before leaving. (Tr. 52.)

40. The officers were not able to catch up with Defendant, who disappeared from sight. (Tr. 19, 51.)

41. Within two hours, the officers swore out warrants before a magistrate at the county jail for resisting, obstruction and delay, and careless and reckless driving. (Tr. 19-20, 51-52.)

42. The warrants were signed by the magistrate. (Tr. 20, 52.)

43. That same morning, a civilian approached another officer, Officer Logsdon, and reported a gun the civilian had found on the ground near one of the hotels on the Westpark Corridor. (Tr. 20-21, 52, 70.) The gun was found in the same vicinity as the traffic stop of Defendant conducted by Officers Overman and Williams. (Tr. 21.)

44. Defendant turned himself in on the warrants granted by the magistrate that

morning. (Tr. 21, 53, 70.)

## II. LEGAL ANALYSIS

"It is well established that 'the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot, even if the officer lacks probable cause.'" United States v. Ward, No. 11-4286, 2012 WL 453330, slip op. at *1 (4th Cir. 2012) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). "Reasonable suspicion is demonstrated when an officer 'points to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity.'" United States v. Mason, 628 F.3d 123, 128 (4th Cir. 2010) (quoting United States v. Branch, 537 F.3d 328, 336 (4th Cir. 2008)); see also United States v. McCoy, 513 F.3d 405, 411 (4th Cir. 2008) ("'Reasonable suspicion' . . . defies precise definition. Far from being susceptible to a 'neat set of legal rules,' it is, as the Supreme Court has described, a 'commonsense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'") (quoting Ornelas v. United States, 517 U.S. 690, 695-96 (1996)). Often acts that could be construed as completely innocent or acts that have innocent explanations can still amount to reasonable suspicion. See, e.g., United States v. Arvizu, 534 U.S. 266, 267 (2002) ("Although each of the factors alone is susceptible to innocent explanation, and some factors are more probative than others, taken together, they sufficed to form a particularized and objective basis for stopping the vehicle."); see also United States v. Johnson, 599 F.3d 330, 346 (4th Cir. 2010) (citing Illinois v. Gates, 462 U.S. 213, 243 (1983)) (noting that innocent behavior will provide the basis for both reasonable articulable suspicion and probable cause). The necessary suspicion for an investigative Terry stop is not a high bar.

See, e.g., Arvizu, 534 U.S. at 274 (noting the reasonable articulable suspicion standard is less than probable cause and "considerably short of satisfying a preponderance of the evidence standard").

The Court finds that the stop of Defendant's vehicle was based on reasonable, articulable suspicion that criminal activity was afoot. The following factors amounted to reasonable articulable suspicion:

1. The area in which the officers were conducting surveillance, first saw Defendant, and conducted the traffic stop was an area well known to the officers specifically for automobile larceny and vehicle break-ins, which the Charlotte-Mecklenburg Police Department called "a 'hot spot' for breaking and entering motor vehicle cases. It's a hot spot every month." (Tr. 7.)

2. The officers were conducting surveillance, and Defendant was present, during a time of night that is typical for automobile larcenies and vehicle break-ins to occur.

3. Defendant drove down Westpark Drive continually looking only in the direction of the hotel parking lots.

4. Defendant was alone in his vehicle at all relevant times.

5. Defendant drove up and down the rows of parked cars in three different hotel parking lots without parking, stopping, dropping off a passenger, or picking up a passenger.

6. While driving up and down the rows of parked cars, Defendant was continually looking in the direction of the parked cars.

7. Defendant exited each hotel parking lot and immediately entered another,

exhibiting the same behavior in three (3) different hotel parking lots.

8. When Defendant saw the officers, who were in uniform, he slowed down.

9. When Defendant saw the officers, he turned around in his seat 180 degrees to look at the officers.

These factors amount to reasonable articulable suspicion when taken in their totality and with consideration of the police officers' perspective. United States v. Ward, No. 11-4286, 2012 WL 453330, slip op. at *1 (4th Cir. 2012) ("In assessing the validity of a Terry stop, '[the] [C]ourt considers the totality of the circumstances giving due weight to common sense judgments reached by officers in light of their experience and training.'") (quoting United States v. Perkins, 363 F.3d 317, 321 (4th Cir. 2004)). The police officers in this case were specially assigned to this area to do surveillance for vehicle break-ins. They had special knowledge of the area, the types of crimes typical of that area, the spike in vehicle break-ins, and the time of day these crimes generally occur. Their knowledge in this case rises well above that of the officers in United States v. Foster, 634 F.3d 243 (4th Cir. 2011), who only had a passing knowledge of a few robberies in the area and suspected the defendant was engaging in a drug crime. Here, the officers' special knowledge of a "hot spot," along with their experience taking notice of the behavior of individuals, and the particular behavior of this individual, led them to have ample suspicion to stop Defendant's car for a reasonable amount of time.[1]

Because the area where Defendant was observed and stopped is known by police for a

---

[1] The Court notes this case is distinctly different from United States v. Jones, No. 11-4268 (4th Cir. May 10, 2012). In that case, the detective conceded that he had no basis to stop the defendant or his car, Id. at 4, and the government did not argue the police had reasonable articulable suspicion. Instead, the government argued that the stop was consensual. See Florida v. Bostick, 501 U.S. 429, 434 (1991). The Fourth Circuit disagreed with the government on the consensual nature of the stop, but reasonable articulable suspicion was clearly absent and never considered by the court as an alternative.

very specific crime, and Defendant's actions matched that crime, the Court engages in a distinct analysis that is different from the more-typical "high crime area" analysis. See, e.g., United States v. Massenburg, 654 F.3d 480 (4th Cir. 2011) (using "high crime area" as one factor to assess the totality of the circumstances in a Terry analysis). This is not a general "high crime area;" instead, it is an area in which one type of crime is common. Furthermore, the Court finds it significant that the area is entirely commercial, and not residential. See United States v. Griffin, 589 F.3d 148 (4th Cir. 2009) (Gregory, J., dissenting) ("[W]hile the fact that a stop occurred in a 'high crime area' is among the relevant contextual considerations, it cannot be an endpoint for a Terry or Long analysis. Otherwise, we relegate those unfortunate enough to have to live in such 'high crime areas' to second-class citizenship for purposes of the Fourth Amendment.").

Of course, even though this is not a traditional "high crime area," Defendant's presence in this area at an odd hour of the night still does not alone amount to reasonable articulable suspicion. See, e.g., United States v. Cortez, 449 U.S. 411, 417 (1981) ("An investigatory stop must be justified by some objective manifestation that the person stopped is, or is about to be, engaged in criminal activity."). Instead, it is significant that Defendant's actions–driving through multiple hotel parking lots, up and down the rows of cars, looking only in their direction–is consistent with the type of crime typical of that area at that time of night. Those actions, coupled with Defendant's reaction when he realized the presence of law enforcement officers, amounts to reasonable articulable suspicion that criminal activity may have been afoot. See United States v. Betemit, 899 F. Supp. 255, 260 (E.D.Va 1995) ("[O]ne factor in the Terry calculus may be a person's reaction upon the appearance of a police officer.").

While the totality of the circumstances may include innocent activity, the innocent

factors must collectively eliminate "a substantial portion of innocent travelers before the requirement of reasonable suspicion will be satisfied," as Defendant's actions do. United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004). Here, Defendant was not breaking any traffic laws; however, he was the only person observed by police driving up and down the rows of cars, looking only in the direction of the parked vehicles, and going through multiple hotel parking lots. It was clear from the officers' observation point that his behavior was peculiar and, in light of their training and experience, consistent with larceny from an automobile. It is also not common for one to turn completely around in their seat at the sight of uniformed police officers in an unmarked vehicle. No other vehicles observed by the officers were exhibiting the same or similar behavior. See generally United States v. Digiovanni, 650 F.3d 498 (4th Cir. 2011) (finding that a list of innocent behavior factors such as driving on the interstate with two shirts and a hygiene bag did not amount to enough to eliminate a substantial portion of innocent travelers).

While the Fourth Amendment clearly guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. Amend. IV, law enforcement also has a duty to investigate suspicious behavior, see New York v. Earl, 431 U.S. 943, 946 (1977); Palmer v. City of Euclid, 402 U.S. 544, 546 (1971) ("A policeman has a duty to investigate suspicious circumstances."). "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable," Wilson v. Arkansas, 514 U.S. 927, 931 (1995), and the officers in the instant case acted reasonably in carrying out their duty to investigate suspicious behavior consistent with crimes that had recently been committed in that area at that time of day. Therefore, Defendant's Motion to Suppress (Doc. No. 10) is DENIED.

Nonetheless, it is important to note that even if the Court had granted the Motion to Suppress, much of the evidence in question would not be subject to exclusion.[2] The gun, for example, was clearly abandoned property. It was found on the street by a random citizen. See, e.g., Abel v. United States, 362 U.S. 217, 241 (1960). Furthermore, Defendant does not claim to own the gun, which means he has no standing to challenge its seizure. See, e.g., United States v. Clark, 891 F.2d 501, 506 (4th Cir. 1989); United States v. Alvarez, 412 Fed. App'x 593, 596 (4th Cir. 2011).

Furthermore, when Defendant fled the scene, he committed a new and distinct crime and warrants were issued for his arrest. Had the Court found the original stop unconstitutional, evidence seized as a result of the new crime, such as the telephone calls from jail while under arrest for the new crimes, would still be admissible. See, e.g., United States v. Sprinkle, 106 F.3d 613, 619 (4th Cir. 1997) ("If a suspect's response to an illegal stop is itself a new, distinct crime, then the police constitutionally may arrest the suspect for that crime . . . [b]ecause the arrest for the new, distinct crime is lawful, evidence seized in a search incident to that lawful arrest is admissible."); United States v. Graham, No. 08-CR-6259L, 2009 WL 4110370 (W.D.N.Y. 2009) ("[Defendant's] decision to flee the traffic stop in a dangerous and reckless manner, disregarding various traffic laws in the process, was an act of his own free will. That

---

[2]There was much discussion during the Court's supplemental hearing of whether the evidence at issue would have been inevitably discovered or was derived from an independent source. See Nix v. Williams, 467 U.S. 431, 444 (1984) (noting that improperly seized evidence may nevertheless be admitted if "the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means"); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920) (recognizing that if facts are discovered by an independent, lawful source, "they may be proved like any others."). Because the Court finds there was reasonable articulable suspicion for the stop, it need not reach whether the same evidence would have inevitably been discovered.

volitional act purged the taint of any illegality of the initial stop.").[3]

### III. CONCLUSION

Defendant's Motion to Suppress (Doc. No. 10) is DENIED because the officers had reasonable articulable suspicion that criminal activity was afoot and therefore lawfully performed an investigative stop pursuant to Terry v. Ohio, 392 U.S. 1 (1968).

IT IS SO ORDERED.

Signed: May 14, 2012

Frank D. Whitney
United States District Judge

---

[3] The case law indicates that this new, distinct crime purges the taint of any original, unconstitutional stop. The Court does not go so far as to find that the identification of the Defendant, which assisted the police officers in swearing out warrants for his arrest, would be admissible. Officer Overman testified the officers obtained Defendant's driver's license for an investigatory purpose, and the vehicle's license plate was registered in Defendant's mother's name, not his own. See United States v. Oscar-Torres, 507 F.3d 224 (4th Cir. 2007) (clarifying INS v. Lopez-Mendoza, 468 U.S. 1032 (1984), and holding that the fingerprints of a defendant are not subject to the exclusionary rule when they are obtained for an administrative–as opposed to an investigative–purpose); but see INS v. Lopez-Mendoza, 468 U.S. 1032 (1984) ("The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred."); Tolentino v. New York, 926 S.E.2d 1212 (N.Y. 2010) (holding that identification from Department of Motor Vehicle records was not suppressible as fruit of an illegal traffic stop because the social costs are great and the police are already sufficiently deterred from conducting illegal stops because the exclusionary rule will apply to other evidence recovered), *cert. dismissed*, 131 S. Ct. 1387 (2011).